Eugene Mullen and Kenneth Benbow, Plaintiffs-Appellees, v. Chicago Transit Authority, et al., Defendant-Appellant.

**Gen. No. 48,223.**

First District, Third Division.
September 27, 1961.
Rehearing denied October 11, 1961.

William J. Lynch, William S. Allen, Erwin Wright and Jerome F. Dixon, all of Chicago, for appellant.

Joseph Barbera, of Chicago, for appellee Eugene Mullen and David F. Silverzweig, of Chicago, for appellee Kenneth Benbow (Charles D. Snewind, of Chicago, of counsel, for appellees).

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

In two personal injury cases consolidated for trial the court entered judgments on verdicts against the Chicago Transit Authority, hereinafter called defendant, in favor of plaintiff Mullen for $25,000 and in favor of plaintiff Benbow for $55,000. From those judgments defendant appeals. There were other defendants in whose favor the court directed verdicts, but no question is here raised concerning those rulings.

The leading point made by defendant is that not only were the verdicts against the weight of the evidence, but there was an absence of the proof required to impose liability. For a consideration of this point, a scrutiny of the facts is necessary.

The accident occurred July 13, 1948, when plaintiffs, then six and eight years old, respectively, came in contact with a third rail on defendant's westbound right of way, 200 feet west of Kostner Avenue in Chicago. There, defendant's tracks leave an elevated structure and run at grade. The grade operation commences about one block east of Kostner Avenue and continues for a distance of about thirteen blocks. Energy is derived from electrically charged third rails, one for trains in each direction. These third rails are twelve inches above ground, about seven inches higher than the rails upon which the cars operate. They carry 600 volts of electricity.

At the northwest corner of the intersection of defendant's tracks and Kostner Avenue a tower was maintained and a gateman controlled gates protecting the crossing. A wooden fence running west of Kostner Avenue separated the right of way from a baseball park to the south. About fifteen months prior to the accident defendant constructed a fence on the north side of the right of way, running from the west side of Kostner Avenue to a point a block west. It was composed of woven wire stapled to posts five feet high. Sign posts on the right of way at Kostner Avenue bore the legend: "Danger, Electric Current, Keep Out." Defendant's maintenance foreman personally inspected the right of way fences twice a year, and maintenance employees did so every day. The fence was 47 inches high, with interwoven wire strands, making openings about 4–½ inches square. It was known in the trade as a "hog-tight" or "cattle-tight" fence. Its purpose, as stated by defendant's maintenance foreman, was to keep people out. The vice-president of Chain Link Fence Corporation testified that the fence was not adequate for its intended purpose; that a chain link fence, also known as a "non-climbable fence" was the type customarily used; and that such a fence should be seven or eight feet high, with closely woven chain link type of wire, which gives it a non-climbable feature. It can be installed with concrete posts so that the bottom is in direct or close contact with the ground. The cost of a chain link fence with steel posts is $2.50 per foot. The type of fence used costs 75 to 90 cents per foot.

There was further testimony to the effect that about 200 feet west of Kostner Avenue a couple of wires at the bottom of the fence were torn; that children would crawl under it to cross the tracks and get to a cherry tree on defendant's property near the southwest corner of the right of way and Kostner Avenue,

or to the ball park, or just to play in and around the general area.

On the day in question, both plaintiffs went to a playground to swim, but when they discovered the pool was closed, decided to pick cherries from defendant's tree instead. They took another boy named Gunder with them, but at a point where there were several holes in the fence, he left them and went home. Gunder testified that he and the other boys had gone to defendant's premises a few days before, and after one of them talked to the watchman, they proceeded to pick cherries. Eugene Mullen testified that after Gunder left, he crawled under the largest hole in the fence, stepped over one of the tracks and on the third rail. At that point he remembers nothing except going through the air and then regaining consciousness in an ambulance on the way to the hospital. He testified that he did not know the third rail carried electricity. Kenneth Benbow, who suffered permanent mental as well as physical injuries, had no recollection of how he had come in contact with the third rail. There is testimony that on regaining consciousness, he told the lineman they were going to cross the tracks to go over and pick cherries.

There were three employees of defendant at the crossing at the time—a gateman, a flagman and a lineman. They saw plaintiffs lying on the track, ran to them, found them unconscious and in contact with the third rail and pried them loose. Other witnesses testified that as children they had played around the area, picked cherries, watched baseball games, put pennies on the track to smash them and make medallions, and "horsed around." One of defendant's employees testified that he had picked cherries from the tree. Other men helped themselves to produce in a vegetable garden kept by the maintenance man near the cherry tree.

Defendant's employees, however, denied they saw any children on the tracks or in the area of the tree. One was the track foreman. On cross-examination, he was shown a three page statement which he acknowledged was signed by him. This impeached his testimony that he never saw any children playing on the right of way. The statement recited that the foreman and other employees of defendant had had to chase children away many times, that often train crews would call in and report there was a child playing on the tracks and some one would be sent out to chase the child away.

The first point made by defendant is stated thus: "Not only was the verdict against the weight of the evidence but there was an absence of proof whereby liability could be imposed upon defendant." In that statement the qualifying word "manifest" is omitted. In recent years there has been conflict and confusion with respect to the yardstick to be applied, and we will review briefly the powers of a reviewing court to pass upon errors of fact.

 The right to a jury trial as protected by the constitution is the right as it existed at common law prior to the adoption of the constitution. In the early history of the common law, the verdict could not be set aside as being against the weight or preponderance of the evidence. The only proceeding was by attaint directed against the jurors for bringing in a false verdict. The penalties were so severe that the proceeding fell into disrepute and in due course the trial courts exercised the right to set aside a verdict as against the weight or preponderance of the evidence. There was, however, no provision for review of error of fact in Illinois until 1837, although a practice had developed at common law which authorized a review on the ground that the findings of fact were not supported by the evidence.

In 1837 the act, now known as Section 92(3b) of the Civil Practice Act, granting power to a reviewing court to review errors of fact, was adopted. It reads as follows:

"Error of fact, in that the judgment, decree or order appealed from is not sustained by the evidence or is against the weight of the evidence, may be brought up for review in any civil case: Provided, that, except as to equitable issues, the Supreme Court shall reexamine cases brought to it by appeal from the Appellate Courts, as to questions of law only."

In Corcoran v. City of Chicago, 373 Ill 567, 27 NE2d 451, the court held the act to be constitutional and upheld the power granted by it, but declared that it must be judiciously exercised. By that admonition the court meant that a reviewing court in passing upon the verdict of a jury should not allow itself the latitude which the common law allowed to the trial court, that is, to set aside the verdict as against the weight or preponderance of the evidence. To express that qualification of the power of the Appellate Court, different terms were used, such as "strong preponderance," "where the verdict was clearly wrong," or "manifest weight." The last phrase, "manifest weight," was the one most frequently used. The foregoing matters are fully discussed, with supporting authorities, in the Corcoran case, supra, and in Bunton v. Illinois Cent. R. Co., 15 Ill App2d 311, 321, 146 NE2d 205, 209.

 The right thus to review error of fact as granted by the Act of 1837 could be exercised only where the motion for new trial was denied and a final judgment entered. The act did not grant a right of appeal from an order allowing a motion for a new trial. That did not come about until 1933. In that year the Civil Practice Act was amended, § 77(2), to

provide for a review of orders of the trial court granting a new trial, as follows:

"An appeal may be taken from an order granting a new trial on leave granted by the reviewing court, or by a judge thereof in vacation, on notice to adverse parties and petition presented to the reviewing court within 30 days after the entry of the order or within any extended period granted upon notice given and motion filed within the 30 days or any extension thereof. Application for an extension of time shall be accompanied by such record and other documents as may be prescribed by rule. The ruling of the court upon a petition for leave to appeal from an order granting a new trial is not reviewable."

There is nothing in that act which changes the yardstick to be applied. *The trial court is still empowered to set aside verdicts as being against the weight or preponderance of the evidence. The Appellate Court is still subject to the restriction imposed by Corcoran v. City of Chicago, supra, and subsequent cases, to a reversal only if the order of the trial court is against the manifest weight of the evidence.* These are not yardsticks which may be applied by rule and line. Nevertheless, they have been discussed and defined in many cases, they have potency, and should not be confused. The question before us, therefore, is whether the verdicts in the instant case are against the manifest weight of the evidence or, as sometimes stated, an opposite conclusion is clearly indicated.

■ ■ Defendant argues that the testimony of those witnesses who were only six to ten years old at the time of the accident is not worthy of credence and should be disregarded; that eleven years having intervened between the accident and the trial of the case, their memory was not reliable; that they could

111

not possibly have played on the tracks without being aware of the hazards of the third rail, and that it is contrary to the general experience of mankind and the laws of science that children could have so played without being electrocuted. To use counsel's language: "It would be as incredible to say that they habitually walked through a tank of acid without being burned or played in a field of land mines without being blown to bits. . . ." People v. Bentley, 357 Ill 82, 103, 191 NE 230, 238, is cited. The facts of that case bear no analogy to the instant case.

The long lapse of time and the fact that these witnesses were only six to ten years old at the time of the accident were factors to be considered by the jury. We have no doubt that defendant's counsel duly stressed those points in his argument to the jury. Neither have we any doubt that to confirm, in part at least, defendant's description of the horrendous consequences which would follow behavior such as the witnesses testified to, plaintiffs' counsel countered by pointing out that a terrible accident actually did result. Whether the account given by plaintiffs' witnesses was accurate in sufficient substance to support their case was for the jury to decide. We cannot say that it was against the manifest weight. To do so would be to disregard not only the testimony of the children, but also the statement of the track foreman that he chased children away on many occasions prior to the occurrence.

■ Defendant states as a legal proposition that no liability could be found in the instant case unless it was proved that defendant had notice of the break in the fence through which the children were said to have gone on the premises. It draws this proposition by analogy from those cases which hold that a municipality shall not be held liable for defects in sidewalks or streets unless it is proved that the city had

actual notice of the defect and the opportunity to repair it, and from the liability of railroads for killing cattle which strayed on their right of way through holes in fences. It appears to us that a more apt analogy would be to compare the instant situation with the operation of a firing range or the handling of explosives in the center of a city, where the utmost caution and the highest degree of care must be used. 19 ILP, Explosives, § 6, p 363. It is not necessary, however, to apply the rule applicable in those cases, as due care in any case means that the care used shall be commensurate with the danger, which in the instant case was very great.

 Defendant complains of error with respect to the testimony of a professor of electrical engineering at Illinois Institute of Technology, who testified that he was familiar with electrically operated railway systems and had observed a protective device or covering over the third rail of such a system in New York City. He said such a protective device could have been used by defendant. Objection is made to this testimony on the ground that the test of liability for negligence in maintaining such facilities is not whether the party should have adopted a particular protective device, but whether it adopted the customary and approved one. Defendant offered no evidence to refute the practicability of the safety measures suggested by this witness. Defendant performs a necessary service in the community and should not be asked to do the impossible, even though its operation may become as dangerous as the use of third rails on the surface in the City of Chicago. On the other hand, its duty under the circumstances in the instant case was to provide every reasonable safeguard. The fact that there was no general custom shown with respect to protection against contact with the third rail does not excuse defendant from using a degree of care commensurate

113

with the danger involved. It is nowhere shown that the use of third rails in a surface operation by a transportation utility in a large city is currently common anywhere. Thus, this situation is clearly distinguishable from Pressley v. Bloomington and Normal Ry. & Light Co., 271 Ill 622, 111 NE 511, cited by defendant for the proposition that the test of negligence is whether the defendant employed the customary and approved protective device. That case dealt with the maintenance of power lines, strung far above the ground, a device commonly in use throughout the country. The extraordinary danger implicit in the use of third rails at ground level should make it most unusual, and we would consider the application of any rule of custom out of the question.

 The next point made by defendant is that error was committed in the instructions. It is first charged that Mullen's instruction No. 5 and Benbow's instruction No. 16 were erroneous in that they are instructions setting forth the theory of plaintiffs' case and are subject to the error found in a similar instruction in Signa v. Alluri, 351 Ill App 11, 19, 113 NE2d 475, 479. The essence of Signa v. Alluri is that the court should not be asked to read to the jury as an instruction the language of a complaint, couched in the partisan, rhetorical verbiage characteristic of such pleadings and asserting and reasserting charges against the defendant. That was the case in Signa v. Alluri, supra. The instruction in question has some of the faults found in that case, but in our opinion not sufficient to make it reversible error. Counsel in preparing instructions must keep in mind that they are the instructions of the court, and the court should speak to the jury in language that has no overtones of partisanship.

Benbow's instruction No. 16 did not list the grounds of negligence charged against defendant, as did the instruction on behalf of Mullen, but merely stated that

114

defendant was charged with negligence "in the same particulars as charged by the plaintiff, Eugene Mullen." It is urged that this is error. The purpose of this reference to the Mullen charge was to avoid a reiteration in the Benbow instruction of the charges made by both plaintiffs. We see no merit in this highly technical point.

We find no reversible error.

Judgments affirmed.

McCORMICK, P. J. and DEMPSEY, J., concur.