THOMAS J. SPENCE, Plaintiff-Appellant, *v.* COMMONWEALTH EDISON COMPANY, Defendant-Appellee.

(No. 59172;

First District (3rd Division)—November 20, 1975.

*Rehearing denied January 20, 1976.*

1060

Kamin, Stanley & Balkin, of Chicago (Frank Stanley, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (Stephen A. Milwid and James L. Pittman, of counsel), for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Thomas J. Spence, brought this action in the circuit court of Cook County to recover damages for personal injuries sustained due to the alleged negligent and wilful and wanton conduct of defendant,

Commonwealth Edison Company. The case was tried before a jury. At the conclusion of all the evidence, defendant tendered a special interrogatory asking whether at the time of and immediately prior to the occurrence the plaintiff was guilty of contributory negligence. The jury answered the special interrogatory in the affirmative and returned a verdict in favor of defendant. Judgment was entered on the verdict and plaintiff appeals.

The amended complaint consists of two counts. Count I states that at the time of the injury plaintiff was in the exercise of that degree of care which a reasonably careful minor of 16 years of age would use under similar circumstances; that defendant owned and maintained certain power lines running along a side-lot easement at the northern boundary of plaintiff's property; and that defendant, notwithstanding its duty to exercise the highest degree of care by complying with the General Order of the Illinois Commerce Commission and its own Distribution Engineering Department Guide, committed one or more of the following acts which was the proximate cause of plaintiff's injuries:

(a) Failed to insulate its power lines when it knew that the location of its power lines created a dangerous and hazardous condition to plaintiff and the members of his household.

(b) Failed to insulate its power line with Tree Wire (EM 28150) pursuant to its District Engineering Department Guide No. DEG-21 when said power line was built in a side-lot easement.

(c) Failed to properly relocate or reposition its power line to eliminate the dangers to plaintiff and plaintiff's household when it knew or should have known, that said relocation or repositioning was necessary to eliminate the dangers to all persons.

(d) Failed to reposition its power line to comply with the General Order of the Illinois Commerce Commission by allowing said power line to have less than 8 feet vertical and/or 3 feet horizontal clearance from plaintiff's antenna.

Count II realleges the pertinent paragraphs of Count I and charges defendant with wilful and wanton misconduct.

In its answer to the amended complaint, defendant denies that plaintiff was exercising due care for his own safety at the time of the occurrence, and alleges that a radio tower and antenna located on plaintiff's property was erected in violation of certain provisions of the Basic Building Code of the Building Conference of America. The answer states that regulations contained in the Basic Building Code were duly adopted and made part of the ordinances of Hoffman Estates pursuant to Article X Section B(1) of Village Ordinance # 34-1961.

On appeal plaintiff makes numerous assignments of error. He contends that the trial court erred in allowing provisions of the Hoffman Estates Building Code into evidence; that the issue of defendant's wilful and wanton misconduct was improperly withdrawn from the jury; that certain paragraphs of the complaint were improperly stricken; that the trial court abused its discretion by denying plaintiff leave to file a second amended complaint; and that the trial court's ruling on numerous evidentiary matters were erroneous. Further, plaintiff argues that the jury was improperly instructed; and that judgment should have been directed as a matter of law on behalf of plaintiff.

The evidence discloses that in 1961 and 1962 defendant planned and constructed electrical installations in Hoffman Estates, Illinois. One such installation was built on a side-lot easement at the northern lot line of property located at 310 Pierce Road in that Village. The easement is designated "side-lot" because it runs along one side of the property, rather than the back of the property (a back-lot easement). The installation consisted of a utility pole (pole # 73) at the northwest corner of the lot, and two bare wires running east and west along the easement. The top wire carried 7200 volts of electricity; the lower wire conducted no electricity. The high voltage wire was built on pole # 73, directly above the neutral wire.

Sometime thereafter the Spence family moved to the dwelling at 310 Pierce Road. The home was a single-floor structure facing in a westerly direction. A garage was attached to the north side of the house. In 1967 plaintiff, then 14 years old, purchased a 30-foot 9-inch radio tower and erected it next to the north wall of the garage. The tower, a three-sided metal structure with stairs for climbing, was imbedded in concrete and bolted to the side of the garage. Plaintiff grounded the tower by wiring it to underground copper rods.

At the time he constructed the tower plaintiff did not know the two electrical wires running in the north side-lot easement were bare. He ascertained that fact, however, on one of his first climbs up the tower. Although he realized one of the lines was a "hot wire" he did not know which line carried electricity and did not know how many volts were transmitted. He knew that 30 feet of galvanized steel constitutes a conductor of electricity and that the human body well grounded coming into contact with electricity is also a good conductor.

In February of 1968 plaintiff purchased a "colinier" antenna to be placed on top of the radio tower. The unit consisted of a 20-foot vertical element and 3 horizontal radial arms. The horizontal arms were bracketed to the lower portion of the vertical element and extended in three directions at 120° angles from each other. The vertical portion of the antenna

was the transmitting and receiving element while the horizontal arms were designed to prevent distortion. The 8-foot 6½-inch radial arms were telescopic in design and their length could be decreased to a little over 4 feet.

Shortly after purchasing the colinier antenna plaintiff placed it on top of the radio tower. The antenna's horizontal arms, extended their maximum 8-feet 6½-inch length, were pointed north, southeast and southwest. About a week later plaintiff replaced the colinier with a "beam" type antenna borrowed from a friend. The "beam" type consists of a 6-foot beam mounted on an 18-foot mast. The beam runs parallel to the ground and three vertical elements cross the horizontal bar. The beam, a directional antenna, is attached to a rotor and can be moved in various directions to send or receive the strongest signal. The colinier antenna is not directional and though the direction of the horizontal radials may vary 20° due to the wind condition, the position of the antenna is not purposefully changed.

The colinier antenna was re-installed on top of the tower by April 1968. That antenna remained on top of the tower "for quite a while" although plaintiff took it up and down to make mechanical adjustments. Plaintiff stated that between August 21 and September 26, 1968, the colinier antenna was on top of the tower and the horizontal arms, extended their full 8-foot 6½-inch length, were directed due north, southeast and southwest.

From the ground to the top of the radio tower was 30 feet 9 inches, and from the top of the tower to the top of the colinier antenna was 20 feet, making the overall height of the structure 50 feet 9 inches. The horizontal radial arms were located 13 inches from the bottom of the vertical element, 31 feet 10 inches from the ground. The uninsulated power line transmitting 7200 volts of electricity was 24 feet from the ground. At the time the radio tower was constructed, the distance between the power line and the north edge of the tower was 7 feet 2¼ inches.

In August 1968, a voltage problem developed due to the increased service requirements in Hoffman Estates. Defendant's engineering department drew plans to add a 3-foot cross arm with a "disconnect device" to pole # 73, the pole situated in the north side-lot easement at plaintiff's residence. Defendant's foreman conducted a field check of the work site on August 21, 1968, to determine the number of workmen necessary to complete the job. On September 26, 1968, defendant's crew leader, Lavergne Reopke, with a crew of two men, came to the site to do the work. Reopke noticed a tower and antenna adjacent to the power distribution line. In view of the proximity of the tower to the uninsulated

7200-volt power line and to better protect the line from damage should the tower fall, Reopke decided to install a 4-foot cross arm rather than the 3-foot arm specified in the engineering plans. The phase wire was moved from its original position on top of utility pole #73 to the north end of the 4-foot cross arm. The horizontal distance between the tower and the phase wire was increased approximately 1 foot 4 inches. In order to reduce strain on the phase wire created by the alteration at pole #73, Reopke attached a 3-foot cross arm onto the next utility pole west (pole #48) and moved the wire to the end of the cross arm. Use of a 4-foot cross bar on pole #73 and addition of the 3-foot arm on pole #48 was a deviation from engineering plans and the modifications were noted in red before the work order was sent back to the engineering department. The work order, plaintiff's exhibit 20, contained the following notation:

> "Removed pole top pin, installed 4 foot alley arm, crossbar, for clearances * * * Install 8 foot special bare cross-arm cut off for 4-foot alley arm.
> Clearance for rotary antenna
> T.V. antenna near phase wire * * *"

An "X" drawn on the map contained in the work order "may have designated the tower."

Subsequent to the installation of the tower and prior to the date of his injuries, plaintiff climbed up and down the tower with the antenna 30 or 35 times. About three weeks before the accident on April 5, 1970, plaintiff took the colinier antenna down from the tower and loaned it to a friend. During that period of time the only antenna on the tower was a small police antenna attached about one-third the distance from the top of the tower and facing south.

On the morning of April 5, 1970, plaintiff, then 16 years old, planned to replace the colinier antenna on top of the tower. He and a school friend, Glen Farfel, brought the colinier antenna back to the site and re-attached the horizontal radial arms to the vertical element of the antenna. The day was windy and near freezing and, after warming up inside the Spence home, the boys returned outside to put up the antenna. Plaintiff, facing north, climbed about 20 feet up the tower and Farfel handed him the uppermost portion of the antenna. Taking the antenna in his left hand, plaintiff tilted it slightly to clear the garage roof and then climbed to where his chin was even with the top of the tower. The antenna was in a vertical position and the horizontal radials pointed north, southeast and southwest. Plaintiff moved the antenna up by sliding it through his left hand and raising it with his right hand.

As to the position of the antenna when it came into contact with the 7200-volt phase wire, Farfel testified that plaintiff had raised the antenna its full length and was attempting to mount it in the tower when the antenna began to sway toward the power line. The antenna tipped one foot north and one of the radial arms came into contact with the 7200-volt phase line. Sparks began to fly and Farfel saw plaintiff fall from the tower onto the garage roof. According to plaintiff, the antenna was about two-thirds of the way up, and the horizontal radials were 7 or 8 feet from the top of the tower, when the antenna's radial arm touched the wire. He heard a loud buzzing in his ears, lost consciousness and next remembers waking up on the roof of the garage.

Immediately after the accident plaintiff was taken to a hospital. There were burns on his hands, arms and thighs, presumably caused by the antenna in contact with the electrical wire. Plaintiff also sustained severe and permanent back injuries.

Lavergne Reopke, called by plaintiff under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 60), testified that the antenna he saw on plaintiff's radio tower on September 26, 1968, was faced in a southerly direction. His only consideration in deviating from specifications contained in the work order for pole # 73, was for the safety of his workmen and the safety of the power line. After completing the alterations, Reopke estimated the vertical and horizontal distance between the power line and the antenna to be 8 to 10 feet. He was aware that a person would climb the tower to take down the antenna and he felt that only a trained person should attempt to do so. He did not inquire further into this matter.

According to measurements taken by plaintiff's expert witness, upon completion of alterations on September 26, 1968, the phase wire was 8 feet 6½ inches north of the radio tower. The vertical distance between the bare phase wire and the colinier antenna was 7 feet 10 inches; the maximum horizontal distance between the phase wire and a northerly faced antenna radial arm was 13¼ inches.

■■■ We initially shall consider plaintiff's contention that the trial court erred in withdrawing from the jury's consideration Count II of the amended complaint alleging wilful and wanton misconduct. It is undisputed that if the jury had been charged concerning the issue of wilful and wanton conduct on the part of defendant, plaintiff's need of proving himself free from contributory negligence would have been eliminated from that count. (*Green v. Keenan* (1956), 10 Ill.App.2d 53, 134 N.E.2d 115.) Only contributory wilful and wanton conduct is a complete defense to an action regarding the same. *Zank v. Chicago, Rock Island and Pacific R.R. Co.* (1959), 17 Ill.2d 473, 161 N.E.2d 848.

■■ Wilful and wanton conduct is difficult to define. Whether an act constitutes such conduct is greatly dependent upon the particular facts in each case and it is within the peculiar province of the jury to consider. (*Kelly v. Burtner* (1941), 310 Ill.App. 251, 33 N.E.2d 754.) A charge of wilful and wanton conduct does not require proof that defendant intended that harm should ensue. It is enough that the evidence tends to show that defendant had notice which would alert a reasonable man that substantial danger was involved, and that defendant failed to take reasonable precautions under the circumstances. (*Hatfield v. Noble* (1963), 41 Ill.App.2d 112, 190 N.E.2d 391.) Moreover, one can be guilty of such conduct not only through an error in judgment but also from a failure to exercise judgment. *Dursch v. Fair* (1965), 61 Ill.App.2d 273, 209 N.E.2d 509.

■■ These principles take on particular significance when electricity is involved. Distribution of electrical energy is an inherently dangerous enterprise and power companies are required to exercise a high degree of care to see that their wires are properly place and insulated. (*McGill v. Illinois Power Co.* (1959), 18 Ill.2d 242, 163 N.E.2d 454; *Ploense v. Illinois Power Co.* (1971), 2 Ill.App.3d 874, 275 N.E.2d 920.) Illinois courts have characterized electricity as "the silent, deadly and instantaneous force" (*Merlo v. Public Service Co.* (1942), 381 Ill. 300, 314, 45 N.E.2d 665), comparable to the "operation of a firing range or the handling of explosives." *Mullen v. Chicago Transit Authority* (1961), 33 Ill.App.2d 103, 113, 178 N.E.2d 670.

■■ Construing the evidence in accordance with these principles, there was testimony from plaintiff that a colinier antenna with one radial arm directed north, was in place atop the radio tower between August 26 and September 26, 1968. Defendant's field engineer viewed the site on August 26, 1968, and defendant's crew completed alterations at the site on September 26. Plaintiff's expert witness testified that upon completion of the alterations, the clearance between a northerly directed antenna radial and the power line was a maximum of 13¼ inches horizontal, 7 feet 10 inches vertical. These distances are less than the bare wire clearance requirements set forth in General Order 160 of the Illinois Commerce Commission and in defendant's District Engineering Guide.

Defendant's crew leader at the site realized that a human being would have to climb the tower to adjust or take down the antenna. He thought that only a trained person should attempt such a task. Notwithstanding this belief, defendant's agent did not warn the Spences or inquire as to whether an experienced person was working with the antenna. The work order, with notations concerning placement of the tower-antenna, was

refiled with defendant's Engineering Department. Defendant's employees did not re-inspect the site and took no action to alleviate the hazard created by the tower-antenna.

■■ This evidence, together with all reasonable inferences, tends to show that defendant had reasonable notice that a substantial danger existed. Failure to inspect the site, insulate the wires, give warning, or take any precaution after receiving notice tends to show a conscious indifference to the consequences and could constitute legal wilfulness. The evidence was sufficient to support a charge of wilful and wanton conduct and the trial court erred by withdrawing this count from the jury.

While this error compels a remand of the cause, we must consider certain other assignments of error which may occur at the new trial.

Plaintiff urges that the trial court committed error in refusing to give to the jury plaintiff's instruction No. 6. That instruction set forth a provision contained in defendant's Engineering Guide and informed the jury that violation of the directive could be considered in determining whether defendant was negligent.

■■ Rules or regulations adopted by defendant, as evidence, serve a useful function in establishing the proper standard of care to be exercised by the defendant. (*Darling v. Charleston Community Memorial Hospital* (1965), 13 Ill.2d 326, 211 N.E.2d 253.) Where such rules or regulations are admitted into evidence, the jury should be informed that they can consider them in determining the standard of care and deciding whether a party's actions constituted a violation of that standard. (*Clements v. Schless Construction Co.* (1972), 8 Ill.App.3d 291, 290 N.E.2d 21.) The court erred in refusing plaintiff's instruction No. 6. We find no error in the court's ruling on any of the other instructions given or refused.

Plaintiff also complains of many evidentiary rulings made by the trial court. We shall comment only on those rulings which we believe to have been erroneously made.

Plaintiff charged defendant with negligence for failing to insulate wires running along the side-lot easement at the northern boundary of plaintiff's property. At trial, plaintiff attempted to substantiate this theory with evidence that wire insulated with 10/64 of an inch of polyethylene was customarily specified for power lines running along side-lot easements, and that defendant deviated from this standard of care by using bare wire on the side-lot installation next to plaintiff's home.

During examination of defendant's employee, Lavergne Reopke, plaintiff's exhibits 22, 23, 24, 25 and 27 were introduced and admitted into

evidence. The exhibits consisted of construction specifications for electrical installations on side-lot easements in the vicinity of plaintiff's residence. The witness had recently visited the locations and stated that the documents correctly portrayed the condition of the power lines.

On examination by defense counsel, the witness stated that the side-lot installations depicted in plaintiff's exhibits contained two or three high voltage power lines (a multi-phase system). The side-lot installation at plaintiff's residence contained a single high voltage line (a single-phase system). According to the witness, the problems and conditions created by a multi-phase system installation were completely different from those of a single-phase system. Wires built on multi-phase installations tended to rub against each other and, to prevent line deterioration and breakage, were generally insulated with 10/64 of an inch of polyethylene. Reopke testified that the number of power lines built on a given installation determined whether insulated wire would be used. Location of the installation (*i.e.*, side-lot versus back-lot) was not a determinative factor.

On re-examination plaintiff attempted to impeach Reopke's testimony and to show that location of an installation determined whether insulated wire was customarily used. Referring to specifications for a multi-phase installation running along a back-lot easement, plaintiff's counsel asked the witness whether the wires were insulated. The court precluded the testimony on the ground the type of wire specified for a back-lot installation had no bearing on what was proper for side-lot installation at issue in this case.

■■ Because Reopke was called as an adverse witness, plaintiff could attempt to impeach his testimony. Indeed plaintiff would be bound by his testimony to the extent it stood uncontradicted. (*Werdell v. Turzynski* (1970), 128 Ill.App.2d 139, 262 N.E.2d 833.) The witness testified that the use of insulation on electric power lines depended on the number of wires built at an installation, and that location of the system was immaterial to the type of wire he used. Evidence that multi-phase wires built on a back-lot easement were bare would tend to impeach the witness's testimony and to substantiate plaintiff's theory that use of insulation depended on location of the wires. The evidence was relevant to test the accuracy and credibility of the expert witness and the question should have been allowed.

■■ Throughout the trial plaintiff claimed that defendant's failure to insulate its wire with 10/64 of an inch of polyethylene was the proximate cause of the injury. Defendant's theory was that 10/64 of an inch of polyethylene did not render the power line safe and failure to insulate,

therefore, could not be considered the proximate cause of the injury. Defendant's electrical engineer testified that wire covered with 10/64 of an inch of polyethylene wire was considered unsafe to touch, except with appropriate equipment. "Voltage rating" is something which "permanently deters the passage of current over a wire-resistance." Wire insulated with 10/64 of an inch of polyethylene, commonly known as tree wire, has no voltage rating. The witness further testified that if there were tiny pinholes in the insulation, the electrical current would not be deterred and wire is, therefore, considered dangerous.

Thereafter plaintiff called an expert witness, Edward Probeck. In response to a hypothetical question the witness stated that if a metal antenna held by an individual came into contact with a bare 7200-volt phase wire, the power from the phase wire would go through the individual's body to the ground. Plaintiff's counsel then asked the witness if he had an opinion as to the electrical condition that would be established, under the same facts, if the phase wire was insulated with 10/64 of an inch of polyethylene. The trial court sustained defendant's objection on the ground that the question invaded the province of the jury.

■■ The fact that an expert witness, in stating his opinion, will testify to an ultimate issue of the case does not render his testimony inadmissible. In *Merchants National Bank v. Elgin, Joliet & Eastern Ry Co.* (1971), 49 Ill.2d 118, 273 N.E.2d 809, the Supreme Court approved the practice of permitting an expert to express his opinion upon ultimate facts of the case, reasoning that since the triers of fact are not required to accept the expert opinion, such evidence does not usurp the province of the jury. Here the issue was whether failure to insulate a 7200-volt power wire with 10/64 of an inch of polyethylene was the proximate cause of the injury. Determination of this question required a degree of expertise if the jury was to reach a considered verdict and it was proper for both sides to elicit expert testimony. The expert opinion would not invade the province of the jury and, in the interest of obtaining the truth in this controversy, the question should have been permitted. *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill.App.3d 971, 326 N.E.2d 74; *Craft v. Acord* (1974), 20 Ill.App.3d 231, 313 N.E.2d 515.

Without discussion, we also believe that plaintiff should have been permitted to elicit expert testimony concerning the definition of certain terms appearing in defendant's District Engineering Guide and Illinois Commerce Commission General Order 160.

Plaintiff also complains that the trial court required expert testimony, based upon the witness's personal knowledge and observation, to be given in response to a hypothetical question. The Building Commissioner

of Hoffman Estates testified that he had personal knowledge as to the location of the radio tower at plaintiff's home and felt that the tower was hazardous because it might fall on the power lines. Plaintiff then inquired as to the result if the tower fell on the power lines. The trial court sustained defendant's objection apparently on the ground that the question was not presented in hypothetical form.

■■ Illinois courts have consistently held that where an expert witness has knowledge based upon personal observation the witness may express his opinion without a hypothetical presentation. (*Sherman v. City of Springfield* (1966), 77 Ill.App.2d 195, 222 N.E.2d 62; *Krueger v. Friel* (1947), 330 Ill.App. 557, 71 N.E.2d 815.) Here, the record shows that the Building Commissioner had personal knowledge of the location of the antenna, and possessed expertise in the area of building construction, inspection and safety. Under these circumstances, a hypothetical question was unnecessary and the question should have been permitted.

We find no error in the trial court's ruling striking paragraphs 10(c) and 10(d) of the amended complaint. Under the circumstances, to impose such a duty on defendant would require it to constantly re-inspect the site and possibly, force it to continually relocate its lines.

Additionally, at the close of all the evidence, plaintiff sought to file a second amended complaint to conform to the proof adduced at trial. The trial court refused to allow the filing of the second amended complaint. In view of our remand, an extended discussion of the ruling is unnecessary. However, we believe that the court erred in denying two proposed amendments.

■■ Plaintiff sought to file one amendment setting forth Commerce Commission regulations, and charging defendant with negligence for failing to "guard" or "isolate" the wire. The evidence adduced at trial raised clear issues as to whether the regulations applied to the installation on plaintiff's property, whether defendant violated the regulations and whether such violation was the proximate cause of the injury. The extensive testimony on the requirements of the regulations indicates that both parties considered these matters to be an important part of the dispute. This proposed amendment served to conform the pleadings to the proof and we think it should have been allowed.

Similarly, it appears that whether defendant breached its duty to plaintiff by failing to warn of a known danger was clearly in issue throughout the trial of this case. The proposed amendment charging defendant with failing to warn should have been allowed.

Other claimed errors are unlikely to occur at the new trial and do not require discussion.

For the reasons stated, the judgment of the circuit court of Cook County is reversed and the cause is remanded for further proceedings not inconsistent with the holdings in this opinion.

Reversed and remanded.

McGLOON, P. J., and MEJDA, J., concur.