FRANK DEL MURO III, Adm'r of the Estate of Frank Del Muro IV, Deceased, Plaintiff-Appellant, *v.* COMMONWEALTH EDISON COMPANY, Defendant-Appellee.

First District (1st Division)   No. 82—3009

Opinion filed May 21, 1984.

McGLOON, J., dissenting.

Philip H. Corboy, Robert J. Glenn, and David A. Novoselsky, all of Corboy & Demetrio, P.C., of Chicago, for appellant.

Stephen A. Milwid, Richard E. Mueller, and Hugh C. Griffin, all of Lord, Bissell & Brook, of Chicago, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Frank Del Muro III, administrator of the estate of Frank Del Muro IV, deceased, appeals from a judgment notwithstanding the verdict which vacated a jury award of punitive damages against defendant, Commonwealth Edison Company. On appeal, plaintiff raises the issue whether the trial court applied the correct legal standard in determining that there was insufficient evidence of wilful conduct by the defendant to support the jury award of punitive damages under the Public Utilities Act (Ill. Rev. Stat. 1981, ch. 111⅔, par. 77). Defendant raises the issue whether plaintiff's consent to a remittitur and the trial court's issuance of a satisfaction of the compensatory damages claim precludes plaintiff's appeal of the punitive damages issue.

Plaintiff's third amended complaint sought compensatory damages for a wrongful death negligence action and a survival negligence action. In addition, plaintiff sought punitive damages for a "wilful" violation of the Public Utilities Act. Ill. Rev. Stat. 1981, ch. 111⅔, par. 77.

Testimony at trial revealed that on June 22, 1977, seven-year-old Frank Del Muro IV was electrocuted when he climbed on top of a Commonwealth Edison transformer inside a substation adjacent to a public park, South Park, in Des Plaines, Illinois. The substation, a gravel-covered rectangular enclosure, measured approximately 60 by 120 feet. The enclosure was surrounded by a 6 foot 3 inch high cyclone fence. On top of the entire fence three strands of barbed wire were strung from 1½-foot-long metal supports called "bayonets." The bayonets were angled outward. Warning signs were posted around the substation. The only gate in the fence was securely locked.

Inside the enclosure there were two transformers of between nine to 12 feet in height. Also, there were circuit breaker and switching gear boxes. On the top of each transformer "live" bushings connected high voltage wires to the transformer. An eight-foot ladder was kept inside the substation, out of sight, to enable the substation operator to reach certain controls near the top of the transformers.

Decedent's six-year-old cousin, Jerry Shepardson, testified that he and "Frankie" were playing in the Del Muro backyard when Frankie said that he was going to take Jerry to his "fort." Frankie took his cousin to the substation enclosure. When they arrived Frankie climbed over the fence and jumped to the ground inside the enclosure.

Jerry was afraid to jump from the top of the fence, so Frankie got a ladder which was leaning against a box next to the transformer and placed the ladder against the fence. Jerry then was able to climb up the fence and climb down the ladder on the other side. Jerry testified that at the spot where the boys climbed over the fence (the east side of the enclosure) two strands of the barbed wire were missing and the third strand was hanging below the top of the fence.

Once inside the enclosure, Jerry started throwing rocks. Frankie said that he was going to use the ladder to climb to the top of the transformer to watch a baseball game. A few seconds after Jerry saw him climb the ladder, Jerry heard a noise "like a fire cracker." Without looking to see what happened, Jerry ran crying to the Del Muro home and told Frankie's mother that Frankie was hurt. Shortly thereafter, paramedics from the Des Plaines Fire Department arrived, broke the lock on the substation and removed Frankie, who was conscious, from the top of the transformer. Frankie suffered burns over 60% of his body. Two months later he died from his injuries.

Jerry testified that he had seen the broken barbed wire in the same condition as it existed on the day of the occurrence 10 months earlier in July 1976. A friend and neighbor of the Del Muro family, Valeria Meitus, also testified that she had noticed that on the east portion of the fence two strands of barbed wire were missing and the third strand was hanging down along the fence. She testified that she first noticed this condition when she moved to the area in July 1976. A park district employee, Lonnie Warnecke, who cut grass and trimmed bushes within the park, testified that he had noticed the "sagging" condition of the barbed wire prior to the accident. He did not specify when he noticed it.

A police officer who arrived at the scene of the accident testified that the wire and the bayonets along the east side of the fence were rusty and deteriorated.

Plaintiff presented the testimony of a professor of electrical engineering, Dr. Ralph Armington, as an expert witness. Dr. Armington testified that the substation in question was the normal type of installation still used throughout the Chicago area and, as constructed, the substation was adequately protected under the Public Utilities Act. He testified, however, that in his opinion the broken condition of the barbed wire atop the fence and the presence of the ladder stored but not locked up within the substation resulted in the premises being inadequately maintained in violation of General Order 160 of the Illinois Commerce Commission. General Order 160 sets forth general safety regulations for public utility equipment. In reaching his opinion Dr.

Armington admitted that he relied on Jerry Shepard's testimony that the condition existed for 10 months and concluded that Edison employees simply did not observe this condition.

Both plaintiff and defendant presented testimony by numerous Commonwealth Edison employees. Warren Weiler, who was division superintendent of substations at the time of the accident, testified that safety was the "number one" concern of Commonwealth Edison and it was the duty of all employees to be responsible for the safety of the public. He testified that the substation was designed to prevent children from getting into it. Weiler visited the substation at South Park the day after the accident. He described the fence as being in a state of disrepair and in need of immediate attention. He testified that it was the duty of the substation operator to put the ladder under the switch gear box, out of sight, when he was finished using it.

George Harper was the crew leader of the maintenance personnel assigned to regularly inspect the substation in question. He, too, testified that safety was a primary concern of Commonwealth Edison. He described the various safety measures taken by Edison. Substation crew leaders and mechanics were required to attend weekly safety meetings at which various topics, including the maintenance of a substation's fence, were discussed. Larger company meetings were held several times a year. Additionally, the company's protective services department inspected each substation once every two to four months and prepared a security report for each substation. The safety department and safety committee distributed safety literature to Edison personnel at least monthly. All substation operators and maintenance crew were required to systematically inspect the entire enclosure whenever they visited a substation. Any employee who noticed an unsafe condition was authorized to fix it immediately if he had the necessary equipment and if not, the employee was to file immediately a maintenance order for a repair crew.

Edison records revealed that in the 16 months prior to the accident, Edison employees visited the substation on over thirty occasions. Harper testified that he last visited the substation before the accident on April 28, 1977. At that time he did not see a break in the barbed wire above the fence. Harper testified that the only repair to the fence of which he was aware was made two years before the accident in question. Harper discovered a child inside the enclosure who had gained access by climbing under the fence to retrieve a ball. Harper filled the hole and strung barbed wire along the bottom of the fence. Frequently Edison personnel would find balls and other items inside the substation, indicating that children were successfully being

kept out of the enclosure.

Charles B. Clark, the substation operator for the South Park substation, testified that he periodically walked around the entire enclosure to check the equipment and the fencing. He made 15 visits to the substation in the year prior to the accident. He last inspected the site on June 6, 1977, 16 days before the accident. He never saw any broken wire or any other condition of disrepair on or around the fence.

Three members of the protective services section, Charles Clifford, Russell Domke and William Elke, testified for defendant. They testified that after their periodic inspections of a substation, members of their section were required to fill out a written report on the condition of the substation which specifically asked if the fencing was adequate and in good repair. All security inspection reports for the substation in question showed the fencing to be in good repair. Clifford testified that he last visited the substation before the accident on April 29, 1977. At that time the broken and sagging condition of the barbed wire had not existed. He also stated that he inspected approximately eight substations on any given day. Domke last inspected the site on February 15, 1977. He testified that the barbed wire and fence were not in the condition found on June 22, because if they had been it would have been reported. Elke testified that on the average the inspection of a substation would last only five minutes.

George Warren, an employee of Edison who did not work at the South Park substation but lived approximately 600 feet from the substation, testified that he could see most of the enclosure from his home. He also walked up to it on many occasions. He testified that he never saw the broken barbed wire at any time prior to the accident.

The jury awarded plaintiff $2.5 million in compensatory damages and $3.5 million in punitive damages. Defendant filed a post-trial motion seeking a judgment notwithstanding the verdict or a new trial on all issues. Defendant alleged *inter alia* that the evidence was insufficient to support either the compensatory or the punitive damages. Defendant also urged that the jury awards were excessive. The motions were briefed and argued by the parties. The trial court then issued a written opinion finding that the compensatory damages verdict was excessive. The court also found that the evidence was insufficient to establish any wilful or wanton conduct on the part of Commonwealth Edison to support the punitive damages verdict. The trial court ordered either a remittitur of the compensatory damages to $1.5 million or, upon plaintiff's failure to consent to a remittitur, a new trial. The court then vacated the punitive damages award and entered judgment notwithstanding the verdict in favor of Common-

wealth Edison on the punitive damages claim.

Plaintiff consented to the remittitur and filed this appeal on the judgment vacating the punitive damages award. Thereafter, defendant tendered a check in full payment of the final compensatory damage award plus interest. Plaintiff refused to accept the check or to execute a satisfaction of judgment unless defendant would stipulate that plaintiff was still entitled to appeal the punitive damages claim. Defendant refused and tendered the check to the court. The trial court, over plaintiff's objection, accepted the tender, satisfied the compensatory damages judgment and ordered the check to be deposited in a bank account for the use of plaintiff and his attorneys.

■■ Initially, defendant contends that plaintiff's acceptance of the remittitur and the trial court's order of satisfaction of the compensatory damages claim should preclude plaintiff's right to bring this appeal. In support of this argument, defendant has cited authority from other jurisdictions: *Kneas v. Hecht Co.* (1970), 257 Md. 121, 262 A.2d 518; *Spanel v. Berkman* (7th Cir. 1948), 171 F.2d 513, which held that a party should not be allowed to accept part of a judgment favorable to him and then pursue an appeal from other unfavorable portions of the judgment. We are not persuaded that under the circumstances of this case we should adopt the rule suggested by defendant. Illinois courts have held that a litigant cannot attack a decree if, by reason of enjoying the benefits of the decree, the opposing party would be placed at a distinct disadvantage upon reversal. (*Lemon v. Lemon* (1958), 14 Ill. 2d 15, 150 N.E.2d 608; *In re Marriage of Petramale* (1981), 102 Ill. App. 3d 1049, 430 N.E.2d 569.) Defendant has not argued that he has been disadvantaged by plaintiff's appeal and, accordingly, we determine that plaintiff is not precluded from pursuing this appeal.

The Public Utilities Act provides for the imposition of punitive damages when a public utility operates in an unlawful manner or omits to perform required acts. Section 73 of the Act states:

> "In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages

for the sake of example and by the way of punishment. An action to recover for such loss, damage or injury may be brought in the circuit court by any person or corporation." Ill. Rev. Stat. 1981, ch. 111⅔, par. 77.

Plaintiff contends that the trial court applied inappropriate legal principles in determining that the evidence did not support the punitive damages award. Plaintiff argues that the question of what constitutes "wilful" conduct is dependent on the particular facts of each case and should have been given to the jury to decide. Plaintiff asserts that the jury should have been allowed to determine the credibility of the witnesses concerning whether the broken condition of the wire existed for 10 months. Plaintiff argues that it is more egregious for defendant to have conducted numerous safety inspections and failed to notice the broken wire, or notice it and fail to repair it, than for defendant to fail to carry out its duty to inspect the substation. (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199.) Although plaintiff argued to the contrary in his written brief, plaintiff conceded in oral argument that the same standard for determining the sufficiency of the evidence of wilful and wrongful conduct to support a claim for punitive damages applies in both common law actions and actions under the Public Utilities Act. Plaintiff contends, however, that this court should reinstate the punitive damages verdict in order to fulfill the public policy underlying the Act and to indicate to the utility that any failure to protect the public from the hazards of electricity will not be allowed.

Defendant contends that there is no evidence whatsoever that defendant was utterly indifferent to or consciously disregarded the safety of others. The only evidence that the condition of the fence existed for 10 months was the testimony of a six-year-old child and the testimony of a family friend. Although the park groundsman testified that he noticed the condition of the fence prior to the accident, there was no testimony as to when he noticed the defective condition. Further, there was no evidence that anyone brought the defective condition to the attention of defendant or that there was anything to indicate that children were climbing over the fence. Indeed, plaintiff's own evidence established that defendant's concern for safety was carried out by regular safety instruction of personnel, by frequent inspections of the substation and by the requirement of written security reports specifying that the fencing was in good repair. Defendant argues that the trial court correctly determined that there was insufficient evidence of wilful conduct to sustain the punitive damages award.

Both parties rely upon two companion cases decided by the Illinois Supreme Court under section 73 of the Public Utilities Act. In each case, the court upheld an award of punitive damages. In the first case, *Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 383 N.E.2d 929, an automobile passenger was killed when defendant's train struck the car in which he was riding. The driver of the car testified that he was unable to see the approaching train because his view was blocked by boxcars stored near the crossing. Testimony at trial established that despite numerous complaints from the mayor and citizens of the local community and a complaint by certified letter from the local school district, defendant continued storing boxcars on the side tracks near the crossing which obstructed a driver's view up and down the tracks. This practice violated an Illinois Commerce Commission rule requiring the railroad to keep its crossings clear of visual obstructions. The court recognized that based upon the record the punitive damages award was warranted to punish the railroad company for its utter disregard of the pleas of local officials and citizens to remove the dangerous obstructions.

In the second case, *National Bank v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 160, 383 N.E.2d 919, decedent's car was hit by a train at a crossing, the view of which was obstructed by trees, shrubs and a house on the railroad's right-of-way. There was evidence that prior accidents had occurred at the same location, yet the railroad had not taken steps to keep its right-of-way clear, and the railroad did not contest the finding that its conduct was wilful. The court noted that section 73 was intended to punish an offender and discourage similar offenses by allowing punitive damages to be awarded whenever an injury results from a defendant's wrongful and wilful statutory violation. The award of punitive damages in that case was also held to be proper.

Plaintiff argues that based upon these cases it was error to withdraw the question of wilful conduct from the jury once plaintiff had made a *prima facie* showing that there had been a conscious disregard of the safety of others in violation of a rule promulgated under the Act. (See *Reiss v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.* (1979), 77 Ill. App. 3d 124, 395 N.E.2d 981.) Defendant asserts that in the *Churchill* and *National Bank* cases wilfulness was shown by evidence of failure to correct a hazardous situation despite prior complaints or prior accidents unlike the present case where there is no such evidence. Defendant urges this court to follow *Mathis v. Burlington Northern, Inc.* (1978), 67 Ill. App. 3d 1009, 385 N.E.2d 780. In that case the court upheld a directed verdict against the plain-

tiff on his count seeking punitive damages for an alleged wilful violation of the Public Utilities Act because there was insufficient evidence of wilful misconduct.

■ A trial court should award a directed verdict and enter judgment *n.o.v.* "only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) We have reviewed the record and find that the trial court properly concluded that there was no evidence that the defendant's failure to maintain the fence was wilful.

Extensive testimony established that the defendant had numerous programs and inspections to insure the safety of the public around the substation in question. There was evidence presented that a prior break in the fence was repaired immediately. Although two witnesses for plaintiff testified that the broken condition had existed for some time, several witnesses for defendant testified that if the broken condition had existed it would have been reflected in their reports. This conflicting testimony, however, does not constitute evidence of wilfulness. Although the court in *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199, held that a long-standing violation, which persisted despite numerous inspections of the site, could constitute wilful misconduct, there was evidence in that case that the railroad knew of the violation and that the violation had existed for 10 years. Plaintiff has cited as additional authority the recent case of *Froud v. Celotex Corp.* (1983), 98 Ill. 2d 324, 456 N.E.2d 131, to support its position that there is a distinction between punitive damages arising in common law actions and those arising in actions under section 73. We find this case inapposite to the issue at bar. Neither the cases cited by plaintiff nor the Public Utilities Act suggests that a lesser standard for the sufficiency of evidence to sustain a punitive damages award for wilful misconduct applies in public utilities cases than in common law cases.

■ Here, as in *Mathis*, the facts do not show an intent to inflict injury or a callous disregard for whether injury will occur. The evidence, when viewed in a light most favorable to plaintiff, is insufficient as a matter of law to support a verdict for punitive damages based upon a wilful act or omission in violation of the Public Utilities Act. In light of our determination of this issue, we need not consider defendant's alternative argument that punitive damages are inappropriate here because of plaintiff's failure to show that defendant's cor-

porate officers authorized the alleged misconduct of its employees.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY, P.J., concurs.

JUSTICE McGLOON, dissenting:

I respectfully dissent from the majority's holding that there was no evidence that defendant's failure to maintain the fence was wilful.

Whether an act or omission constitutes wilful conduct is within the peculiar province of the jury to consider. (*Sprague v. Commonwealth Edison Co.* (1978), 59 Ill. App. 3d 342, 375 N.E.2d 493.) In order to establish wilful conduct it is not necessary to prove that defendant had actual knowledge of an impending danger and failed to take reasonable precautions to prevent it. The Illinois Supreme Court has advised this particular defendant that utter indifference or conscious disregard for the safety of others can be established where the evidence discloses that defendant failed to discover a dangerous condition through recklessness or carelessness when it could have been discovered by ordinary care. *Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481, 211 N.E.2d 720.

The principles governing wilful conduct have been held to take on particular significance when the distribution of electrical energy is involved. (*Spence v. Commonwealth Edison Co.* (1975), 34 Ill. App. 3d 1059, 340 N.E.2d 550.) Power companies are required to exercise extraordinary care due to the inherently dangerous nature of their business. (*Spence; McGill v. Illinois Power Co.* (1959), 18 Ill. 2d 242, 163 N.E.2d 454.) The menace of electricity has been characterized as a silent, deadly, instantaneous force comparable to the operation of a firing range. (*Spence,* citing *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 45 N.E.2d 665, and *Mullen v. Chicago Transit Authority* (1961), 33 Ill. App. 2d 103, 178 N.E.2d 670.) Because the dangers connected with the distribution of electricity are not obvious to the general public, a power company's own employees are best qualified to discover the potential hazards of electricity. *McGill v. Illinois Power Co.* (1959), 18 Ill. 2d 242, 163 N.E.2d 454.

It is true, as stated in the majority opinion, that there is conflicting testimony regarding whether the barbed wire was deteriorated and in a state of disrepair prior to the accident. Indeed, this is not surprising inasmuch as the only question to be determined as a pre-

requisite to the imposition of punitive damages is whether defendant wilfully violated a rule promulgated under the Public Utilities Act. However, I disagree with the majority's conclusion that conflicting evidence cannot support a finding of wilfulness.

Defendant's employees testified that regular inspections were conducted to ensure that the high voltage transformers located within the electrical substations were properly guarded. Defendant's safety log reflects that substation C—17 was inspected on 43 occasions during the 16 months preceding the accident. Defendant's records further indicate that no new barbed wire has been placed at this location since 1948.

Mr. Harper, a 32-year employee of defendant, testified that because the safety of the general public was defendant's primary concern, workers had been instructed that the public was to be protected from contact with the equipment. Harper further testified that any disrepair of the fencing which would allow children to gain access to the substation would be an unsafe condition requiring immediate attention.

Another lifelong employee of defendant, Mr. Weiler, acknowledged that barbed wire was intended to prevent children from climbing over the fence. In order to accomplish this goal, defendant passed regulations which required all three strands of barbed wire to be kept intact at all times.

Through the testimony of its employees, defendant acknowledged that it had a duty to maintain the barbed wire along the fence and to keep the ladder stored within the enclosure. Defendant's defense, therefore, was simply that the barbed wire did not exist in a state of disrepair, as plaintiff's witnesses claimed. Defendant stressed that had it been in such a state prior to the accident, defendant would have been aware of the condition and remedied it.

However, the jury refused to believe the testimony of defendant's employees. Instead, they accepted as credible the testimony of plaintiff's witnesses. In addition to the testimony of a "six-year-old child" (who was 11 years old at the time of trial) and a "family friend," plaintiff introduced the testimony of Mr. Warnecke and Sergeant Randolph. Mr. Warnecke noticed the sagging condition of the barbed wire prior to the accident. Sergeant Randolph described the fence along the east side of the station as having two strands of wire completely missing and one strand sagging. The bayonets designed to reinforce the barbed wire were rusty and deteriorated. One was completely obstructed by shrubbery.

The jury also heard extensive testimony from plaintiff's witness,

Dr. Armington. He testified that in his opinion defendant violated numerous sections of General Order 160 of the Illinois Commerce Commission, which sets forth minimum standards for the proper installation and maintenance of electrical equipment. These sections were designed to protect the general public and especially children from gaining access to high-voltage equipment.

After hearing the evidence, the trial court determined that there was sufficient evidence to instruct the jury that punitive damages could be awarded if defendant was guilty of wilful and wanton conduct. They were also instructed as to the definition of wilful and wanton conduct. Resolving the question of credibility of the witnesses against defendant, the jury returned a substantial punitive award against defendant indicative of their determination that defendant's conduct constituted a wilful violation under the Act.

In my judgment, there is substantial evidence in the record to support the jury's finding that defendant's wilful violation of the Act caused the electrocution of a seven-year-old boy. By substituting its own judgment for that of the jury regarding whether defendant's conduct was wilful, the trial court invaded the constitutional prerogative of the jury to weigh the credibility of the witnesses. (*Buer v. Hamilton* (1964), 48 Ill. App. 2d 171, 199 N.E.2d 256.) Also, it was error for the trial judge to strike the award after the jury returned their verdict.

Defendant's concern for safety which was demonstrated by the numerous inspections it conducted cannot insulate defendant from punitive liability where its "concern" did not extend to rectifying the condition which gave rise to plaintiff's decedent's injuries.

This court recently considered an analogous case wherein plaintiff established that the defendant railroad had allowed the crossing to fall into a state of disrepair causing plaintiff's injuries in *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199. As did defendant in the instant case, the railroad denied having actual knowledge of its crossing being in a state of disrepair. However, the jury believed plaintiff's witnesses who testified that the crossing had been in a state of disrepair prior to the accident. The court noted that "the fact that the condition at the crossing existed is itself sufficient evidence that the railroad failed to conduct proper maintenance to correct the violation." (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 711, 450 N.E.2d 1199, 1206.) This reasoning is equally applicable to the case at bar. Aside from the testimony of several witnesses, possibly the best evidence of defendant's failure to adequately maintain the fence to prevent the public

from coming into contact with 34,500 volts of raw electricity is the fact that two young children successfully gained access to the substation.

The *Hazelwood* court also commented upon defendant's reliance on the railroad's inspections:

"[T]here is evidence in the record that the railroad inspected the crossing frequently. It is far more egregious for the railroad to continue to inspect the crossing and then fail to repair it than for the railroad to simply fail to inspect. Consequently, it is clear from the record before us that, as a matter of law, the railroad's actions justified the imposition of punitive damages." 114 Ill. App. 3d 703, 711, 450 N.E.2d 1199, 1206.

It is equally clear in the instant case that defendant's actions justify the imposition of punitive damages.

The trial court, and now this court, was apparently influenced by the fact that since the substation's construction in 1948, there was only one prior incident where a young child gained access to the substation through a defect in the fencing. Defendant argues that having introduced a myriad of evidence establishing its overall concern for safety, it cannot be found to have exhibited a conscious disregard for safety which would warrant punitive liability. However, this argument distorts the intention of the legislature in passing the Public Utilities Act. The public policy underlying section 73 of the Act is clear:

"Unquestionably, the Public Utilities Act intends to punish an offender and discourage similar offenses by allowing punitive damages to be awarded whenever an injury results from a defendant's wrongful and wilful statutory violation. *It would pervert the Act's intention if reprehensible conduct, so severe in consequence that resultant injury, culminating in death, was to be insulated from punitive liability under the act designed to vigilantly promote safety by public utilities." Froud v. Celotex Corp.* (1983), 98 Ill. 2d 324, 332, 456 N.E.2d 131, quoting *National Bank v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 160, 174, 383 N.E.2d 919, 924.

Despite defendant's claim that it was concerned about safety, the jury having been properly instructed, concluded that defendant acted in utter disregard for the public's safety. There was sufficient evidence that defendant was aware of the defect through its frequent inspections and in violation of General Order 160 of the Illinois Commerce Commission failed to repair it. There was also evidence that defendant violated General Order 160 by failing to store the ladder which plaintiff's decedent used to climb the transformer. Defendant's

actions show an indifference to public safety and a punitive damage award will reassure the public that an indifference to its safety will not be tolerated in the future. (*Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 383 N.E.2d 929.) The trial court's refusal to permit the imposition of punitive damages "for the sake of example and by way of punishment" undermines the legislative intent contained in the clear language of the Public Utilities Act. Ill. Rev. Stat. 1981, ch. 111²/₃, par. 77.

As stated above, my review of the record indicates that defendant's actions justify the imposition of punitive damages in the instant case. Therefore, I must consider whether the jury's award of $3.5 million is excessive. In *Hazelwood*, the court outlined three factors which should be considered in determining whether an award is excessive. They are: (1) the egregiousness of the act; (2) the financial status of the defendant; and (3) the potential liability of the defendant in situations where defendant faces multiple liability for the same or similar wrongs. *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199.

Having applied these factors, I find that the award is excessive. I would reduce the award to $1 million. This amount fairly reflects the seriousness of the injury and the magnitude of the wrong without threatening the financial stability of defendant. The award represents .0294% of defendant's net worth, which is $3,396,934,000. (See *Hazelwood*, wherein the court determined that an award representing .0237% of defendant's net worth was proper.) Finally, the reduced award of $1 million is substantial enough to discourage similar offenses in the future, thereby fulfilling the public policy underlying section 73 of the Public Utilities Act. *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 712-15, 450 N.E.2d 1199, 1207-08.