DONALD V. SPRAGUE *et al.*, Plaintiffs-Appellants, *v.* COMMONWEALTH EDISON COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 76-1724

Opinion filed April 18, 1978.—Rehearing denied May 18, 1978.

Robert J. Rafferty, of Chicago (Seymour Ogden, of counsel), for appellants.

Lord, Bissell & Brook, of Chicago (C. Roy Peterson, Richard E. Mueller, and Hugh C. Griffin, of counsel), for appellee Commonwealth Edison Company.

Schaffenegger, Watson and Peterson, Ltd., of Chicago (Jack L. Watson, of counsel), for appellee Gust K. Newberg.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This appeal arises from an action brought by plaintiffs, Donald and Kathleen Sprague, to recover for severe and permanent injuries sustained by Sprague and allegedly occasioned by the negligent or wilful and wanton conduct of defendants, Commonwealth Edison Company (hereinafter "Edison") and Gust K. Newberg Construction Company (hereinafter "Newberg").[1] Plaintiff's injuries resulted when a mobile crane, owned and operated by Newberg and for which plaintiff was acting as signalman, contacted an electric power line suspended over the

---

[1] Kathleen Sprague joined suit to recover for a loss of consortium. Hereinafter, all reference to "plaintiff" will connote Donald Sprague.

Dresden nuclear power plant located near Joliet, Illinois, and operated by defendant Edison. Upon a jury trial, a general verdict was returned in favor of both defendants and against plaintiff.

Judgment was entered on the verdict and plaintiff currently appeals contending: (1) that the verdict was contrary to the manifest weight of the evidence; (2) that the trial court erred in permitting the jury to consider the issue of plaintiff's contributory negligence or contributory wilful and wanton conduct; (3) that certain evidentiary rulings of the trial court were improper and served to deny plaintiff a fair trial; and (4) that defendant Edison's argument to the jury was improper and prejudicial.

A review of the evidence reveals that on March 1, 1972, plaintiff was employed as a welder and pipefitter by F. Conry Mechanical Contractors and had been assigned as a work foreman on certain construction then underway at the Dresden power plant. Plaintiff had been employed on the site for approximately 4 years and was aware that power lines were suspended overhead which, if contacted by an electrical conductor, would transmit electric current through such conductor. In fact, double circuits of wire were suspended at heights of 21 feet, 26 feet, 6 inches, and 32 feet, and each wire carried 34,500 volts. Atmospheric conditions on the date in question were variously described as "foggy," "misty," "cloudy," and "damp." Under optimum conditions the actual height of these wires was difficult to estimate from ground level due to a lack of visual reference points. Accordingly, normal safety procedures to be employed when operating in the vicinity of such wires included allowing a clearance of 10 feet from the wires.

Plaintiff's assignment on the date in question had been to transport certain pieces of pipe a distance of approximately 125 feet within the confines of the job site and in the immediate vicinity of the power lines suspended overhead. Plaintiff was assisted in this operation by a fellow employee, Sam Bretto, and a Newberg employee, Al Barra, who operated a mobile crane or "cherry picker" which was required to move the pipe sections. On February 28, 1972, two days before the accident, plaintiff and Bretto had unloaded the pipe without incident from a truck by using the "cherry picker" which had been operated by a different Newberg employee, Byril Swanson. Plaintiff acted as signalman[2] for Swanson in order to direct the movements of the "cherry picker" and specifically warned Swanson of the power lines.

The mobile crane was equipped with a boom 10 feet in length which could be extended, retracted, raised and lowered by means of controls located in the cabin near the operator's seat. A cable with a hook on its

[2] A "flagman" is an escort who leads construction machinery from one point to another. A "signalman" works with a "cherry picker" to provide its operator with signals to raise, lower or swing the boom and its load.

end extended down from the tip of the crane boom and was also operated by a control in the cabin. In order to lift lengthy sections of pipe, the men employed "spreaders" (*i.e.*, two equal length wire cables with a hook on one end and an eye on the other). The hooks on the other end of the cables were either attached to the ends of the pipe or, if the pipe was longer than the "spreaders," the "spreaders" would be wrapped or "choked" around the center of the pipe. The "cherry picker" was equipped with a windshield and a roof window which was covered by a wire mesh guard of unknown specifications. The "cherry picker" was capable of being driven forward under its own power and with the boom in an elevated or lowered position. When in the latter configuration, the boom tip would be 10-12 feet above the ground.

On the date of the accident, plaintiff again acted as signalman and directed Barra in moving the section of pipe as planned. During the maneuver the boom was positioned at a 45° angle. Thereafter, Barra centered the boom and began to lower it to a horizontal position. However, Barra stopped when plaintiff stepped in front of the crane, seized the "spreaders," looped them over his shoulders and motioned to Barra to move forward. Barra complied and the crane moved forward. Barra testified that he kept his eyes trained on Sprague; that he relied upon Sprague exclusively for directions; that he was unaware of the height of the boom at this time; and, that the boom tip was not visible to him due to the inclement weather conditions. Barra did not exit his cabin so as to estimate the height of the boom in relation to the overhead wires and, since Barra was unfamiliar with the area, placed complete reliance upon plaintiff to direct him. Barra indicated that he knew that plaintiff was an experienced workman who had previously worked on the particular job site.

The crane had proceeded forward but a short distance when the boom came into contact with the power line suspended 21 feet above ground level. An explosion followed and electric current was conducted through the crane assembly and into plaintiff's body, causing him severe injuries and necessitating the amputation of plaintiff's left arm.

Photographs taken at the scene shortly after the accident show the boom entangled in the overhead wires suspended approximately 26 feet above ground level. Plaintiff, who characterized himself as a "pretty good judge of distance," testified that he observed the crane boom immediately prior to walking forward and estimated that it was approximately 15 feet above the ground. Plaintiff also stated that in his estimation the lowest power line was approximately 25 feet above ground level; that there was "plenty of room" under the lines within which to maneuver the crane; that it was a customary practice for a workman to carry the "spreaders" if a short distance was to be traversed rather than attach them to the body of

the crane; and, had the boom remained in the position at which plaintiff observed it the accident would not have occurred. The testimony of Sam Bretto corroborates plaintiff's estimate of the height of the boom and wires. The several Edison employees who testified at trial also over-estimated the height of the power lines.

Plaintiff further testified that while he was walking he did not feel any "pull" on the "spreaders" as might be experienced if the boom had been raised during this time. At trial, Barra denied that he moved the boom after he received plaintiff's signal to proceed forward. It was established that the crane cable could be released while the boom was simultaneously being extended and elevated. However, this would require great dexterity on the part of the operator inasmuch as the maneuver would require moving three levers in different directions while steering the crane. Further, it appears that all the controls were powered by the same system in such a way that the boom would always rise faster than the cable could be paid out. If the boom was raised, the hook and "spreader" assembly would always be raised to some extent. According to operator Swanson, it would be "impossible" to alter the position of the boom either by elevation or extension without changing the position of the hook.

Plaintiff initially contends that the jury's verdict was unreasonable, arbitrary and unsupported by the evidence. In support of this position, plaintiff maintains: (1) that the evidence was sufficient to establish negligence or wilful and wanton conduct on the part of each defendant, which conduct proximately caused plaintiff's injuries; and (2) that, as a matter of law, plaintiff was free of either contributory negligence or wilful and wanton conduct so that the trial court erred in submitting these issues to the jury for its consideration. As we review the case, we can but conclude that it presented factual questions for the jury.

■■■ Wilful and wanton conduct is difficult to define with precision. Whether an act constitutes such conduct is greatly dependent upon the particular facts of each case and it is within the peculiar province of the jury to consider. (*Kelly v. Burtner* (1941), 310 Ill. App. 251, 33 N.E.2d 754.) A charge of wilful and wanton conduct does not require proof that the party intended that harm should ensue. It is sufficient that the evidence tends to show that the party had notice which would alert a reasonable man that substantial danger was involved and that the party failed to take reasonable precautions under the circumstances. (*Hatfield v. Noble* (1963), 41 Ill. App. 2d 112, 190 N.E.2d 391.) Moreover, one may be guilty of such conduct not only through an error in judgment but also from a failure to exercise judgment. (*Dursch v. Fair* (1965), 61 Ill. App. 2d 273, 209 N.E.2d 509.) In order to establish wilful and wanton conduct the act or omission must not only be negligent but exhibit an utter indifference to or conscious disregard for a person's own safety or the

safety of others. *Turner v. Commonwealth Edison Co.* (1976), 35 Ill. App. 3d 331, 341 N.E.2d 488. See also *Jarvis v. Herrin City Park Dist.* (1972), 6 Ill. App. 3d 516, 285 N.E.2d 564.

Plaintiff submits that the evidence was sufficient to establish that defendant Edison was guilty of such conduct in that Edison failed to insulate the wires in the vicinity of the job site, failed to inspect the job site, and failed to provide adequate warning with respect to the height of the various wires.

Whether the defendant power company was negligent for failing to insulate its wires at the location of the accident was a factual question requiring consideration of the particular conditions and circumstances, including whether it was reasonably foreseeable that persons might come into proximity of the wires. (*Ploense v. Illinois Power Co.* (1971), 2 Ill. App. 3d 874, 275 N.E.2d 920.) Electricity is an inherently dangerous and deadly force which should be regarded with a high degree of care by those engaged in the business of supplying electrical energy.[3] *Clinton v. Commonwealth Edison Co.* (1976), 36 Ill. App. 3d 1064, 344 N.E.2d 509. ■■ The evidence in the instant case, together with all reasonable inferences, tends to show that defendant Edison had actual notice that a substantial danger existed. Evidence was also adduced to establish that an unrelated incident occurred at the site approximately 3 months prior to the date of the accident in question when a dump truck struck a wire adjacent to that involved in the instant case. The evidence also tends to establish that aside from this incident the area had been used under construction conditions for an extended period of time without incident. In any case, whether defendant Edison's failure to otherwise inspect the job site, insulate those wires in the immediate vicinity of the job site, or employ other specific warning devices evinces a conscious disregard for or utter indifference to the safety of others present questions properly within the domain of the jury as trier of fact. *Spence v. Commonwealth Edison Co.* (1975), 34 Ill. App. 3d 1059, 340 N.E.2d 550; *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354.

Defendant Newberg relies upon the proposition that a failure to see what is visible is not such conduct as is compatible with due caution for one's own safety, and, in the instant case, evidenced a conscious and utter disregard for plaintiff's own safety. (*Hedge v. Midwest Contractors Equipment Co.* (1964), 53 Ill. App. 2d 365, 202 N.E.2d 869.) Indeed, in its brief before this court, defendant Newberg does not expressly dispute

---

[3] Within this context, it is necessary to take into consideration other factors in addition to foreseeability in determining defendant's legal duty, including: the likelihood of injury; the magnitude of the burden of guarding against it; the consequences of placing the burden on defendant as well as public policy and social requirements. *Clinton v. Commonwealth Edison Co.*

plaintiff's contention that Newberg employee, Al Barra, failed to exercise ordinary care with respect to the operation of the "cherry picker." It is well-settled that a party has no right to knowingly expose himself to danger and then recover damages for an injury which might have been avoided by the exercise of the requisite care. *Withey v. Illinois Power Co.* (1961), 32 Ill. App. 2d 163, 177 N.E.2d 254.

■■ The complaint in the instant case charged defendant Newberg with both negligence and wilful and wanton conduct. No special interrogatories were submitted to the jury with respect to these issues. A general verdict was returned in favor of both defendants and against plaintiff. The general and long accepted rule of law is that contributory negligence of the plaintiff is a defense for a defendant charged with negligence. The corollary of this rule, which is of more recent origin, is that contributory wilful and wanton conduct of the plaintiff is a defense for a defendant charged with wilful and wanton conduct. Only contributory wilful and wanton conduct is a complete defense to an action regarding the same. *Zank v. Chicago, Rock Island & Pacific R.R. Co.* (1959), 17 Ill. 2d 473, 161 N.E.2d 848.

At the outset it must be noted that this operation undertaken at the Dresden work site on Edison property was extremely hazardous, involving heavy construction in the immediate vicinity of highly energized power lines suspended merely 21 feet above ground. Within this context, it cannot be said, as a matter of law, that defendant Newberg was free of negligence or wilful and wanton conduct with respect to the operation of the "cherry picker." By agreeing to maneuver his crane while the boom was in an elevated position and without attempting to personally discern the height of the boom in relation to the overhead power lines, Newberg's employee displayed an obvious lack of care for his own safety and that of others. The jury might have properly found that such carelessness constituted wilful and wanton conduct attributable to defendant Newberg.

Nor may plaintiff, as a matter of law, avoid all responsibility for the unfortunate height of the boom and the accident which occurred as a result. At trial, plaintiff acknowledged that he bore a duty to be on the alert for obviously hazardous conditions such as energized, low-slung, overhead power lines; that he was aware of this particular danger; and, that he did not warn the operator of the hazard.

The testimony of plaintiff and that of his co-worker, Sam Bretto, suggested that the boom was no more than 15 feet above ground level which, if true, would have provided sufficient clearance to avoid the power lines. Their estimates are not beyond question, however, in light of both employee's failure to accurately gauge the height of the power lines. While plaintiff contends that the boom was raised after he estimated its

height, plaintiff admits that he felt no "pull" as might have been experienced had such an elevation taken place as he walked forward in advance of the "cherry picker" carrying the "spreader" assembly over his shoulders. Clearly, the boom should have been reduced to its lowest height and plaintiff's signal to the crane operator was instrumental in preventing this obvious safety measure from being implemented. The jury might properly have found that such close tolerances were grossly unreasonable and chargeable to plaintiff as signalman for the crane operator.

Moreover, it should also be noted that plaintiff elected to carry the "spreaders" over his shoulders under power lines which plaintiff assumed would cause electrocution if contacted by a metallic object. Plaintiff also chose this means of performing his task under circumstances where he admitted that the precise height of the wire was difficult to discern and the crane boom, on plaintiff's direction, was not lowered to its lowest level. Plaintiff testified that he was authorized to attach the "spreaders" to the "cherry picker" during a repositioning of the vehicle. While plaintiff testified that it was an ordinary practice to personally carry the "spreaders" under similar circumstances, operator Byril Swanson testified that in his considerable experience he had never observed a workman carry the "spreaders" for even a short distance. Other expert testimony indicated that it would be the duty of a workman "walking the spreaders" to take "special precaution."

Plaintiff evinced a lack of care for his own safety. In light of the obvious and tremendous risk of death or serious personal injury, plaintiff chose an extremely unsafe means of performing his work and may be deemed to have contributed to his injuries in this regard. See *Shannon v. Addison Trail High School* (1975), 33 Ill. App. 3d 953, 339 N.E.2d 372.

■■ The jury was in the best position to assess these competing considerations, evaluate the culpability, if any, of the parties' conduct, and determine the proximate cause of plaintiff's injuries. The jury's verdict is not contrary to the manifest weight of the evidence and shall remain undisturbed by this court. *Spankroy v. Alesky* (1977), 45 Ill. App. 3d 432, 359 N.E.2d 1078.

Plaintiff next contends that certain evidentiary rulings by the trial court were improper and served to deny plaintiff a fair trial. Specifically, plaintiff asserts that such error occurred with respect to his attempted impeachment of Al Barra regarding the height of the boom at the moment the "cherry picker" commenced its journey toward the power lines.

There was considerable dispute at trial concerning the height of the boom at various times during its use prior to the accident. The record and the various analyses provided by the parties on this point are equally

confused. It appears that on direct examination and during plaintiff's cross-examination of the witness, Barra estimated that the tip of the boom was approximately 20 feet above ground level at the time he was moving the pipe and at the moment that he centered the boom after putting the pipe down. In a deposition given prior to trial, Barra indicated that he believed "the boom might have been somewhere in the neighborhood of 15 feet" above the ground at the point in time in which he started to lower the boom. Barra also indicated that he "thought that would be the maximum" but that he "was not certain." While it is unclear from the record, these two estimates appear to have concerned two different time periods and, hence, the trial court was correct in ruling that the attempted impeachment was improper.

■■ In any case, review of the record establishes that plaintiff's counsel subsequently questioned Barra as to the height of the boom at the moment Barra received plaintiff's signal to move forward in the direction of the power lines. Barra repeatedly stated that he could not see the tip of the boom but admitted that the height of the boom "could have been approximately 15 feet" above the ground at this most relevant time. Plaintiff's counsel seized upon this admission and argued the obvious inferences to the jury during closing argument. Any error which might have conceivably resulted to plaintiff from the trial court's ruling must be deemed harmless.

Plaintiff also argues that defendant Newberg's attorney was allowed to disparage the credibility of plaintiff's witness Sam Bretto by improperly attempting to impeach Bretto on a material issue (*i.e.*, visibility on the job site) and subsequently failing to offer proof of any prior inconsistent statement.

■■ Plaintiff failed to make a timely objection to this procedure and must be deemed to have failed to preserve this issue for appellate review. Indeed, plaintiff did not choose to raise the point prior to an amendment to his post-trial motion filed eleven months after the jury returned its verdict. In any case, the prejudice which plaintiff currently asserts as mandating reversal of the jury's verdict is not self-evident. The colloquy about which plaintiff complains appears as follows:

> "Q. I believe you said that the weather was damp and slightly drizzling and there was some fog in the distance. Wasn't the fog right there, where you were working?
>
> A. No, sir.
>
> Q. Do you remember, on November 2, 1972, a man came to your house in Coal City or late in the afternoon or early evening, and asked you a lot of question about this, and prepared a long-hand report?
>
> A. No, I don't.

Q. Offered it to you to sign? You don't remember that?

A. I don't remember that, sir.

Q. Do you remember that it happened at all, regardless of whether you remember that it was November 2nd? Do you remember that ever happening?

A. No, I don't. No, I don't.

Q. You, of course, can write and sign your name, can't you?

A. Yes, sir.

Mr. Guy: Would you mark this as Defendants' Exhibit 4, for identification, please.

(Document marked as requested.)

Mr. Guy: Q. Let me show you seven pages of writing, at the bottom of each there is a name. Would you look at the bottom of each page and tell me whether that is your signature seven different times?

A. Yes, it is.

Q. So you did sign this document, then?

A. Yes, sir.

Q. This is the original, I mean, this is not a copy, this isn't a copy, is it?

A. No.

Q. Does the fact that you signed this refresh your recollection as to whether the document was prepared?

A. No, it doesn't.

Q. It doesn't? You still don't remember?

A. I don't remember, no, sir.

Q. Do you remember saying that the weather was damp, cloudy and foggy and not windy?

A. You mean at that particular time?

Q. Hm-Hm.

A. No, sir, I don't.

Q. You don't?

A. I don't remember anything on it.

Q. But that is your signature?

A. Yes, sir."

The witness' description of the weather in the statement ("damp, cloudy, and foggy, not windy") was essentially the same as his trial testimony on direct examination:

"Q. [Mr. Rafferty] By the way, what kind of weather was it that day, Mr. Bretto?

A. Damp, very light drizzle and a little fog in the distance."

The statement was later admitted into evidence, without objection, for the limited purpose of establishing that Bretto signed it seven times.

Plaintiff's suggestion that an "inconsistency" developed when defendant's counsel asked Bretto whether the fog was not "right there where you were working" is not well-taken. At best, this question was simply an attempt to obtain a factual admission. There was no reference to any statement of the witness on this point and defense counsel never intimated that the witness made a contrary statement at a prior time.

■■ Plaintiff finally contends that the closing argument of defendant Edison was improper and prejudicial. Again, plaintiff failed to make a timely objection to the comments in question and has failed to perfect the issue for appellate review. In any case, plaintiff suffered no prejudice by these comments:

> "He has got to prove that he was free of contributory negligence or wilful and wanton misconduct, that the defendant was negligent or committed wilful and wanton conduct, that the negligence or wilful and wanton conduct of the defendant proximately caused the accident, and that the plaintiff was injured, but he has got to prove all four, not just one or two or three. Because of his contributory fault, under those instructions, was just part of what caused this accident, then under the law, the defendants are entitled to a verdict.
>
> Now, that is a hard one to swallow and not all people like that, but I just want you to think of one little problem when you are in the Jury room. I don't suppose that anyone likes Watergate or likes what the C.I.A. is doing to us. We are not there in the jury room, but if you don't follow the law, you are doing the same thing to our system of justice that Mr. Nixon did and the C.I.A."

Taken in its appropriate context, counsel merely used these current events in order to illustrate and impress upon the jury their sworn duty to follow the law.

Accordingly, for the aforementioned reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.