(No. 59408

DELBERT LUBBERS, Appellee, v. NORFOLK AND WESTERN RAILWAY COMPANY, Appellant.

*Opinion filed November 30, 1984.—Rehearing denied February 1, 1985.*

RYAN, C.J., and MORAN, J., dissenting.

Nicholas J. Neiers and John E. Fick, of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellant.

Robert D. Owen, Marshall A. Susler and Linda M. Castleman, of Owen, Roberts & Susler, Ltd., of Decatur, for appellee.

JUSTICE SIMON delivered the opinion of the court:

On July 20, 1977, Delbert Lubbers drove a grain truck through flashing signal lights at a railroad crossing and collided with a Norfolk & Western train. The train's engineer was killed, Lubbers and the train's brakeman suffered severe injuries, and the truck was destroyed and the train damaged. Lubbers filed suit in the circuit court of Macon County against Norfolk & Western (Norfolk), the brakeman and the engineer's estate. Norfolk counterclaimed against Lubbers, and in December 1979 the jury found that Lubbers was negligent and awarded the railroad $650 and Lubbers nothing on the basis of that finding. Judgment was entered on this verdict and was affirmed by order of the appellate court. *Lubbers v. Norfolk & Western Ry. Co.* (1980), 89 Ill. App. 3d 1205 (Rule 23 order).

This appeal concerns Lubbers' attempt under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1401) to set aside the judgment and obtain a new trial. His petition, filed September 15, 1982, in the Macon County circuit court alleged that Norfolk knowingly gave false answers to interrogatories, gave false testimony at trial, and used threats to assure the silence of a witness who had knowledge of the subject matter of the false testimony and whose name should have been included in, but was withheld from, the answer to an interrogatory. The petition further stated that Lubbers' counsel first learned of these circumstances fortuitously on March 5, 1982, after being approached by the witness concerning another matter, that the failure to discover them earlier was not due to lack of diligence on Lubbers' part, and that the verdict against Lubbers would probably not have been entered had the foregoing information been available at trial. The circuit court dismissed the petition and denied Lub-

bers leave to amend. The appellate court, in a divided opinion, reversed and remanded on the authority of our opinion in *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273. The dissenting judge took the position that the newly discovered evidence had no bearing on the finding that Lubbers was himself negligent, which, under the law as it existed before *Alvis v. Ribar* (1981), 85 Ill. 2d 1, would have completely barred his recovery. (118 Ill. App. 3d 705.) We granted leave to appeal (87 Ill. 2d R. 315).

The complaint filed by Lubbers in 1977 charged Norfolk with negligence in failing to provide adequate warning of the approach of a train at its crossing in Oakley, failing to maintain the warnings that were provided in a condition free from defects, and failing to repair a crossing signal which it knew or should have known to be defective. It alleged that Lubbers himself exercised due care at all times. After Norfolk filed an answer to the complaint denying these allegations and counterclaiming for damage to the train based on Lubbers' negligence in crossing the track against an operating signal, Lubbers' attorney presented Norfolk with a series of interrogatories concerning the extent of Norfolk's knowledge of a defective condition at the Oakley crossing prior to the accident. Norfolk answered "yes" to a question concerning whether the signals at the crossing were "functioning at the time of the accident." The next interrogatory sought the names and addresses of all persons who observed the signals at that time and the nature of their observation. In its response Norfolk named 10 individuals who saw the crossing lights flashing on the day of the accident, and in addition stated, "Signals checked on July 6, 1977, by David F. Flannell, *** were found to be operating as intended." The response did not mention Richard Polley, a signal maintenance man employed by Norfolk, or Donald Patterson, assistant superintendent

of Norfolk's Decatur division.

Another interrogatory asked if there was an established schedule for checking the functioning of the Oakley crossing signals and requested information concerning "what the schedule was, the last date the signals *** were checked, in what manner were they checked and what were the findings." Norfolk responded "yes" to the first part of the question and went on to state:

"(b) Flashers are checked every two weeks
"(c) 7/6/77
"(d) Drop crossing relay of serving operation of all lights with AC power off. Observe operation of all lights with AC power on. Reenergize X.R."

In a separate request for discovery, Lubbers' attorney asked Norfolk to produce at trial "[a]ll records in [your] possession regarding: *** b. All maintenance and repairs made to said flashers or bells [at the Oakley crossing] from 1966 to date." Norfolk produced a document which was identified at trial as the log book of David Flannell, the signal maintainer in charge of inspecting the signals at the Oakley crossing. The document contained ledger entries indicating twice-monthly inspection of the crossing; it showed an entry for July 6, 1977, with the notation "OK" beside it, and showed similar entries indicating inspections and "OK" 's at roughly two-week intervals for each of the preceding 12 months. Flannell asserted at trial that he made each entry as a record of an inspection and testified concerning the nature of the various kinds of inspection which the log book indicated for various dates. He stated that the notation "OK" meant that he found nothing wrong with the crossing signals following an inspection.

At trial Lubbers testified that on the day of the accident he was hauling a truckload of grain to Peoria and was forced to take an unfamiliar route. Before he started out he was warned by the farmer whose grain he was hauling that the east-west road he would take into Oakley made a

"bad and dangerous" crossing over a railroad track. The testimony does not indicate that he was told anything more specific about the crossing. His testimony and that of several other witnesses established that the crossing in question was dangerous because of the narrowness of the road, the elevation of the track area slightly above the ordinary level of the road, and the angle at which the tracks crossed the road, which was so acute that the Oakley crossing was commonly referred to as "Angle Crossing." Lubbers and the farmer both testified that the sharp angle made it very difficult to see down the tracks to the right, and that the difficulty was compounded by the height of the corn along the side of the road and by the bed of Lubbers' truck. According to Lubbers' testimony, which was generally corroborated by the farmer who was following Lubbers to Peoria in his own truck, Lubbers was traveling northward toward the east-west road when he glimpsed a train moving at about 45 to 55 miles per hour in a southwesterly direction along a track somewhere beyond the east-west road. He lost sight of the train after turning onto the east-west road and did not observe it cross the Oakley crossing, but he first saw the crossing lights flashing when he was about a quarter mile from them. He proceeded westward toward the crossing at 20 miles per hour, and when he reached the crossing the lights were continuing to flash but no train had come. He maneuvered his truck into a position perpendicular to the tracks and noticed, to the left, that the southwest-bound train he had observed had passed through the crossing some time earlier and that there were no northeast-bound trains coming. He looked twice to the right, the direction in which his view was obstructed, and could see about a quarter mile up the tracks but saw and heard nothing denoting the approach of a train. He proceeded across the tracks, and as he was doing so he heard a train whistle and almost immediately afterward was hit by a southwest-bound train which had

come from the direction in which he was looking.

A witness testified that he had crossed the Oakley crossing at 2:30 p.m. and 11:30 p.m. on the day before the accident and that on both occasions the crossing lights were flashing but no train came. The farmer whose grain Lubbers was hauling testified that in the early morning of the day of the accident he observed signal lights flashing at three different crossings of the same Norfolk line in Cerro Gordo, three miles northeast of the Oakley crossing, but no train came. David Flannell testified when called as an adverse witness by Lubbers that inclement weather might so saturate the ballast around the rails as to close the electrical circuit in the signal-triggering device between the rails and cause the lights to flash in the absence of a train. The day of the accident, however, was described as sunny.

The jury answered "yes" to a special interrogatory asking if Lubbers' own negligence was a proximate cause of his injuries, and awarded Norfolk $650 in its general verdict.

Slightly more than two years after judgment was entered on the verdict, Richard Polley, whose name had not come up during discovery or trial, informed Lubbers' attorney that he had inspected the signal at the Oakley crossing shortly after the accident occurred and discovered that the signal-inspection card in the crossing-signal control case contained no reports of any inspections on July 6, 1977, or for six weeks prior to the accident, reports which the card should have contained had the inspections been made. He showed the card to his supervisor, Donald Patterson, who took the card from him and warned him not to say anything to anyone about it if he wished to keep his job. Lubbers' section 2--1401 petition, which was supported by Polley's affidavit, stated that if what Polley said was true David Flannell's testimony concerning his semi-monthly inspection of the Oakley crossing signal was false and that the log book on which it was based had been deliberately

falsified to mislead Lubbers and the jury. The petition sought to reopen the case to take account of this newly discovered evidence. It also alleged that Norfolk's intentional concealment of the names of Polley and Patterson in its answers to interrogatories, its false response to the interrogatory concerning the date of the most recent inspection before the accident, and its attempt to silence Polley by threat were independent evidence of Norfolk's culpability "which standing alone would probably have prevented the judgments rendered against [Lubbers]."

Section 2—1401, formerly section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 72), permits parties to seek "[r]elief from final orders and judgments, after 30 days from the entry thereof, \*\*\* upon petition \*\*\* supported by affidavit or other appropriate showing as to matters not of record." (Ill. Rev. Stat. 1983, ch. 110, pars. 2—1401(a), (b).) The petition must be filed within two years of the entry of the order or judgment complained of, but time during which the ground for relief is fraudulently concealed is excluded in computing the two-year period. Ill. Rev. Stat. 1983, ch. 110, par. 2—1401(c); see *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 282.

The history of section 2—1401 has been one of evolution from the strict pleading rules and limited applicability of the common law writs into a simplified petition procedure applicable to many different kinds of judgments with a view toward the prevention of injustice. (See Davis, *The Scope of Section 72 of the Civil Practice Act*, 55 Ill. B.J. 820 (1967).) Proper regard for the finality and stability of judgments prevents the use of this remedy as a vehicle for relitigating factual matters appearing in the record and adjudicated earlier by valid means. (*Brunswick v. Mandel* (1974), 59 Ill. 2d 502; *Davis v. Chicago Transit Authority* (1980), 82 Ill. App. 3d 987.) Thus the alleged errors of fact on which such a petition is based must not have been known to the court or the moving party at the time of

judgment. (*E.g., In re Marriage of Ayers* (1980), 82 Ill. App. 3d 164, 171.) This rule does not operate to preclude petitions based on newly discovered evidence bearing on the ultimate issue of the original trial, particularly where the prevailing party has engaged in fraudulent conduct designed to conceal the evidence from the petitioner before trial. *Ellman v. De Ruiter* (1952), 412 Ill. 285, 292, held that a petition under section 72 of the Civil Practice Act was "addressed to the equitable powers of the court, when the exercise of such power is necessary to prevent injustice." (See *Elfman v. Evanston Bus Co.* (1963), 27 Ill. 2d 609, 613; Ill. Stat. Ann. ch. 110, par. 2—1401, Joint Committee Comments (1955), at 602 (Smith-Hurd 1983).) In *Ostendorf v. International Harvester Co.* the court set aside a judgment in response to a petition which alleged that defendant fraudulently concealed a report by its own engineers expressing the opinion that the design of a tractor was dangerous. We stated there that a petitioner seeking relief from a judgment must show first that the ground asserted for relief would have prevented the entry of judgment against him had it been known at trial, and second that failure to discover or present the ground for relief was not the result of petitioner's own lack of diligence. (89 Ill. 2d 273, 283; see *Brockmeyer v. Duncan* (1960), 18 Ill. 2d 502, 505.) We also ruled that a party should not be foreclosed from such relief on a motion to dismiss if "it did not clearly appear that petitioner[ ] could never have proved any set of facts that would entitle [him] to relief." *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 282.

The petition in this case was not untimely, and Lubbers was not guilty of lack of diligence. As we stated in *Ostendorf*, "[A] litigant exercises ordinary diligence in pretrial discovery when he poses interrogatories reasonably calculated to elicit the information important to his case. If his opponent then suppresses information within the scope of

the interrogatories in such a way as to prevent the inquirer from realizing what has occurred, the failure to discover the information is the result of the former's fault, not of the latter's negligence." (89 Ill. 2d 273, 284-85.) The petition clearly alleges that Lubbers submitted interrogatories concerning witnesses at the accident scene and the frequency with which Norfolk checked the signals at the Oakley crossing, and that Norfolk deliberately withheld the names of Polley and Patterson and led Lubbers to believe that the signals were inspected regularly twice monthly with an inspection having been made as recently as two weeks before the accident. Nor do we find Norfolk's contention that Lubbers failed to depose any of the Norfolk employees whose names were given in answer to interrogatories or to examine the items submitted in response to Lubbers' request for documents to be significant. As made clear in *Ostendorf*, the diligence requirement of section 2—1401 does not go so far as to force parties acting in good faith to assume the possibility of fraud in the answers to discovery requests and to take extraordinary steps to discover it in the limited time they have before trial. There is no indication here that Lubbers had reason to suspect that anyone was engaging in deception before Polley came forward. Even if it were conceded that depositions of employees or examination of documents would have revealed evidence that Norfolk had neglected to examine the signal and later attempted to conceal its neglect, a possibility which seems highly unlikely given the threat to Polley and the conspiracy of silence such conduct would seem to imply, it would distort the concept of equity to hold that diligence required Lubbers to depart from his chosen pretrial strategy to anticipate or guard against the kind of chicanery alleged here.

Norfolk argues that, in any event, the newly discovered evidence offered by Lubbers cannot justify reopening the case because it does not affect the finding that Lubbers

was negligent, a finding which it contends dictated the verdict in favor of Norfolk under the law of contributory negligence which then prevailed. The appellate court majority avoided this issue by holding that Norfolk's act of suppressing evidence of its own misconduct, if established to a jury's satisfaction, would have been an admission by conduct of the ultimate issue of liability. We need not go so far, however, in view of Lubbers' argument that he could have added a count asserting wilful and wanton misconduct to his complaint had he learned in response to his discovery requests that the Oakley crossing signal had not been checked for six weeks prior to the accident. This is a theory of liability for which there was little, if any, evidence at the original trial and which, if established, would have subjected Norfolk to liability despite ordinary negligence on the part of Lubbers. (*Little v. Blue Goose Motor Coach Co.* (1931), 346 Ill. 266, 272; *Mattyasovszky v. West Towns Bus Co.* (1974), 21 Ill. App. 3d 46, 50, *aff'd* (1975), 61 Ill. 2d 31.) In this regard, Lubbers also points out in his brief that Norfolk was subject to an order by the Illinois Commerce Commission to install and maintain automatic flashers at the Oakley crossing pursuant to the Commission's determination that that crossing was "extra hazardous" within the meaning of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111²/₃, par. 62). The existence of such an order might be found to have plainly informed Norfolk that severe injury would naturally and probably result from a failure to maintain the flashers at the Oakley crossing. Norfolk's failure to inspect the flashers at all for six weeks, in the face of actual knowledge of its duty to maintain them, could be viewed as such conscious or reckless disregard for consequences as to merit a wilful or wanton characterization (*Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481; see *Sprague v. Commonwealth Edison Co.* (1978), 59 Ill. App. 3d 342; *Spence v. Commonwealth Edison Co.* (1975), 34 Ill. App. 3d 1059), to which Lubbers'

contributory negligence, if any, would not be a defense.

We cannot agree with Norfolk's contention that the evidence of noninspection cannot be the basis for a new trial because it is cumulative. (*Crane Co. v. Parker* (1922), 304 Ill. 331.) Evidence of malfunction is ordinarily nothing more than an indication that somehow something went wrong, but such evidence combined with evidence of noninspection may add up to wilful misconduct by the party charged with maintenance, particularly where, as here, that party was subject to a continuing governmental order to install and maintain the thing which malfunctioned and the public safety was clearly involved. (Compare *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 284.) Moreover, we are not dealing merely with new evidence of noninspection but with allegations of conduct which was intended to and did frustrate the discovery process and impeded Lubbers in his attempts to formulate a theory of the case and a strategy for trial. Such conduct is especially to be condemned because discovery is supposed to enable counsel to decide in advance of trial not only what the evidence is likely to be but what legal issues can credibly be argued (see *Williams v. A. E. Staley Manufacturing Co.* (1981), 83 Ill. 2d 559, 565); indeed, it is partly for this reason that parties are permitted to amend their pleadings at any time before trial or judgment (Ill. Rev. Stat. 1977, ch. 110, par. 46, now Ill. Rev. Stat. 1983, ch. 110, par. 2—616). Parties should not be permitted to avail themselves of a verdict obtained by deluding an opponent as to what the facts or the issues in a case really are. We believe that the "outcome-determinative" requirement of section 2—1401 is met if it reasonably appears that the undiscovered evidence which was wrongfully withheld or falsified in discovery would have prevented the entry of judgment against the petitioner. As we find that to be the case here, we conclude that the circuit court erred in dismissing Lubbers' petition without leave to amend.

We therefore remand the cause to the circuit court for further proceedings and with instructions to grant leave to Lubbers, if he so desires, to amend his section 2—1401 petition in view of the resolution of this case by this court.

*Affirmed and remanded,*
*with directions.*

CHIEF JUSTICE RYAN, dissenting:

Whether the petition under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401) be considered on the basis of negligence, as the appellate court did, or on the basis of wilful and wanton conduct, as does the majority of this court, the allegations do not establish a basis for a new trial. I must, therefore, dissent.

The evidence clearly established that the crossing signals were malfunctioning at the time of the accident, in that they were flashing continuously. The jury was well aware of this. However, the malfunctioning of the signals was not the proximate cause of this accident whether the malfunctioning signals constituted negligence or wilful or wanton misconduct.

When the plaintiff approached the crossing, he stopped his truck and looked for oncoming trains. That is exactly what the crossing signals would have alerted him to do if they would have been functioning properly. They could have done no more, and this is so whether or not the fact that they had not been properly maintained or checked was concealed from the plaintiff. The plaintiff could not see the approaching train as he looked to his right, not because of any defect in signals or because of the fact they had not been properly maintained, but because he did not position himself in his truck so that he could have a clear view of the tracks to his right for a sufficient distance to assure him that he could safely cross the tracks.

The train was obviously too close to the crossing to per-

mit plaintiff to safely cross the tracks. Although the plaintiff stated he looked to his right, he obviously did not look far enough down the tracks to see the train. He, nonetheless, proceeded onto the tracks in the face of flashing signals, not having taken the necessary precaution to ascertain it was safe to do so. This was the conduct which the jury found to be the proximate cause of the accident. This conduct remains the proximate cause of the accident whether the defendant is charged with negligence or wilful and wanton misconduct, whether or not the signals had been properly maintained, or whether or not the maintenance record of those signals had been concealed from the plaintiff. I therefore must dissent.

JUSTICE MORAN joins in this dissent.